IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN REID-DOUGLAS, | : | |
| DANIELLE REID-DOUGLAS, | : | |
| Plaintiffs, | : | 1:17-cv-1988 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| WARDEN KEVIN DEPARLOS, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## **MEMORANDUM**

### **October 17, 2019**

Plaintiffs Steven Reid-Douglas ("Mr. Reid-Douglas") and Danielle Reid-Douglas ("Mrs. Reid-Douglas" or "Scott")[1] (collectively referred to as "Plaintiffs"), formerly pretrial detainees housed at the Lycoming County Prison ("LCP"), Williamsport, Pennsylvania, initiated this civil rights action pursuant to 42 U.S.C. § 1983 on October 30, 2017.[2]  (Doc. 1).  The matter is presently proceeding *via* an Amended Complaint (Doc. 39) filed on January 10, 2018.

---

[1] At various points throughout the record, Danielle Reid-Douglas is identified as Danielle Scott and Danielle Marie Scott.  "Danielle Scott" is the name under which she was charged and committed to the Lycoming County Prison.  (Doc. 5102, pp. 2-16; Doc. 65, p. 16).  The name affixed to her September 23, 2019 declaration is "Danielle Scott Reid Douglas".  (Doc. 109).

[2] Mr. Reid-Douglas is currently incarcerated at the Lackawanna County Prison, Scranton, Pennsylvania; Mrs. Reid-Douglas is housed at the State Correctional Facility at Cambridge Springs, Pennsylvania.

Pending before the Court is a motion (Doc. 85) pursuant to Federal Rule of Civil Procedure 56, filed by Defendants Kevin DeParlos ("DeParlos"), Brad Shoemaker ("Shoemaker"), Chris Ebner ("Ebner"), Michael White ("White"), R. Jack McKernan ("McKernan"), Tony R. Mussare ("Mussare"), and Richard Mirabito ("Mirabito"), seeking an entry of summary judgment on Plaintiffs' remaining claims, Count I "Violation of First Amendment Right to Intimate Association" (Doc. 39, pp. 3-7), and Count II "Retaliation for Exercising First Amendment Right" (*Id.* at 10, 11).

Initially, in response to Defendants' statement of material facts asserting that that Plaintiffs have failed to adduce any evidence that Defendant Ebner violated their First Amendment rights, Plaintiffs state "[t]his averment is undisputed; thus, this defendant is voluntarily being dismissed." (Doc. 86, ¶¶ 69, 77; Doc. 108, p. 9, ¶¶ 68, 76). The complaint against Defendant Ebner will be dismissed, with prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(2).

Remaining for disposition is the First Amendment right to intimate association claim against Defendants DeParlos, Shoemaker, McKernan, Mussare, and Mirabito, and the First Amendment retaliation claim against Defendants DeParlos, Shoemaker, McKernan, Mussare, Mirabito, and White. For the reasons

set forth below, the Court will grant the motion for summary judgment regarding these remaining claims.

Also pending is Plaintiffs' motion (Doc. 99) for a protective order, which will be denied.

## I.    <u>Motion for Protective Order</u>

Plaintiffs seek a protective order striking personal correspondence between Plaintiffs that was confiscated on October 26, 2017, during a search of Mrs. Reid-Douglas's cell.  (Doc. 99).  Because the Court will not consider the correspondence in any manner in deciding the motion for summary judgment, the motion will be denied as moot.

## II.    <u>Motion for Summary Judgment</u>

### A.    <u>Standard of Review</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2 d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out ... that there is an absence of evidence to support the nonmoving party's claims." *Id.* at 325.

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in

order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322. The adverse party must raise "more than a mere scintilla of evidence in its favor" and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989). The mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. *Anderson*, 477 U.S. at 249–50.

### B. Statement of Material Facts

#### 1. First Amendment Right to Intimate Association

Plaintiffs, who are legally married, were committed to the Lycoming County Prison ("LCP") on June 15, 2017, as pretrial detainee codefendants charged in a criminal conspiracy case. (Doc. 86, ¶¶ 1-4; Doc. 108, p. 2, ¶¶ 1-4). Upon commitment, Plaintiffs received a copy of the Inmate Handbook. (*Id.* at 7; Doc. 108, p. 2, ¶ 7; Doc. 87, p. 24). The handbook contains the following inmate mail policy: "Unless authorized by the prison administration inmates are not permitted to correspond with other inmates. Sometimes, immediate family members are permitted to correspond with one another, but must receive permission before doing so." (*Id.* at 5; Doc. 87, p. 21; Doc. 108, p. 19). The policy is memorialized

in LCP Prison Policy 16.1 "Inmate Mail," which states in relevant part: "1. Inmates are not permitted to correspond with prohibited parties or through a third party. 2. Inmates are not permitted to correspond with inmates in other sections of the prison or with inmates in other correctional institutions without prior permission of prison administration. This includes Lycoming County Prison inmates transferred to other county prisons." (Doc. 86, ¶ 6; Doc. 87, p. 23; Doc. 108, p. 23).

In June 2017, shortly after their incarceration, in accordance with the above policy, Plaintiffs sought permission to directly correspond with one another. (Doc. 86, ¶ 8; Doc. 108, p. 3, ¶ 8; Doc. 108, pp. 24-35, 38). The requests were denied. (Doc. 108, p. 3, ¶ 9; Doc. 108, pp. 24-35, 38, 39). Defendant Shoemaker denied Plaintiffs' requests based on security concerns and risks associated with inmate-to-inmate correspondence, as well as the concern that "as co-defendants and alleged co-conspirators they would be even more likely to communicate about illegal activity." (Doc. 86, ¶¶ 23, 30; Doc. 87, ¶ 23; Doc. 108, p. 27-35). He did not find that Plaintiffs' circumstances warranted an exception to the policy. (Doc. 86, ¶ 22).

Plaintiffs unequivocally dispute "that the circumstances of the present case did not warrant an exception to Defendant's [sic] rule. Inasmuch as Plaintiffs had

a pending Emergency Custody Petition pending with regard to the safety of their children which several weeks after the Plaintiffs' incarceration the 12 year old son passed away in the care of the biological father and through the neglect of Children and Youth Service that was the sole basis of filing such Petition due to the children facing imminent danger while in the custody of the biological father as such danger came to pass on July 3, 2017. Thus, correspondence between the Plaintiffs was dire in the present case amongst other matters." (Doc. 108, p. 4, ¶ 22).

According to Defendant Shoemaker, formerly employed as the Deputy Warden of Operations at LCP, and currently employed as the Warden at LCP, the inmate mail policy was put into place to ensure the safety of prison staff and inmates against the risks associated with inmate-to-inmate communications. (Doc. 86, ¶ 10; Doc. 87, Declaration of Brad Shoemaker ("Shoemaker Decl."), pp. 9, 10, ¶ 19)). "The purpose, rationale, and reasoning behind the prohibition is to protect the safety and security of the Prison from the risk that inmates may communicate to: a. develop and maintain informal organizations, such as gangs, which pose a threat to the safety and security of Prison staff and/or other inmates; b. communicate the layout of the Prison; c. communicate escape plans; d. coordinate the movement of contraband into and out of the Prison; e. coordinate violent acts against Prison staff and/or other inmates; f. communicate the number, movement,

and schedule of Prison staff on shift at a given time; and, g. track the movements of other inmates." (*Id.* at 11; *Id.* at 19).

Defendant Shoemaker, suggests that, as an alternative to the inmate-to-inmate correspondence ban, one Plaintiff could relay information to a friend or relative who could then relay the information back to the other Plaintiff. (Doc. 86, ¶¶ 33, 34).

According to Defendant Shoemaker, monitoring Plaintiffs' letters would have a negative effect on other inmates and prison resources; LCP has only one staff member per day who, in addition to correctional officer duties, is solely responsible for screening incoming mail for contraband. (Doc. 86, ¶ 16). LCP, which is almost always at its population capacity of 256 inmates, does not have the manpower, time, money or training to monitor inmate-to-inmate correspondence "which would require staff to read, decipher, and evaluate all potential threats contained or hidden within said mail." (Doc. 86, ¶¶ 13-15, 17, 18; Doc. 108, p. 3, ¶ 15). He further notes that "Correctional Officers at the Prison are already at their capacity in terms of responsibilities. They are responsible for covering cell-blocks and operations on a 24 hours a day, 7 days a week, 365 days a year basis, and in addition they from time to time must cover inmate transports and hospitalizations. It would be a massive drain on Prison personnel and Prison resources to allow

inmate-to-inmate mail on the condition that such mail may be carefully screened for hidden messages." (Doc. 86, ¶¶ 19, 20).

Because of the negative impact such a screening process would have, LCP has no alternative to the policy that generally bans inmate-to-inmate mail, unless permission is obtained. (*Id.* at 21).

Plaintiffs dispute that the policy is reasonably related to legitimate security interest because two prisoners housed at LCP, Kasan Sanders and Isis Dent, could directly correspond with one another while housed at LCP. (Doc. 108, p. 3, ¶¶ 10, 11). They further "dispute that the policy is necessary to protect prison staff and inmates from serious security threats inasmuch as there is no policy regarding co-defendant or co-defendant spouses." (*Id.* at 12). They dispute that it would be a massive drain on prison personnel and resources to allow monitoring of inmate to inmate correspondence because, as demonstrated by the following, it is a function correctional officers already perform: 1. A declaration of an LCP inmate, Bryan Bacon, who declares that other inmates, Mr. Tomecki who was housed at LCP and his wife, Mrs. Tomecki, who was housed at LCP's Pre-release center, were approved to correspond with one another. (Doc. 108, Declaration of Bryan Bacon, pp. 36, 37); 2. Memoranda from Defendant Shoemaker, dated February 5, 2018, advising Plaintiffs that their incoming and outgoing mail will be read and reviewed

until further notice based on interception of third party mail. (Doc. 108, pp. 52, 53); and, 3. Various inmate requests dated May, June and August 2018, indicating that their third party mail had been intercepted. (Doc. 108, pp. 3, 4, ¶¶ 14, 21, pp. 52-59).

### 2. First Amendment Retaliation

LCP has an established a three-step grievance process, which is set forth in the Inmate Handbook, and requires the filing of an initial grievance, an appeal to the Warden, and a final appeal to the Prison Board. (Doc. 86, ¶ 35; Doc. 108, p. 6, ¶ 34). Mr. Reid-Douglas filed a grievance on November 12, 2017, alleging that misconducts issued on October 13, 2017 and October 26, 2017, were in retaliation for him filing a mandamus complaint. (*Id.* at 37; Doc. 108, p. 6, ¶ 36). Defendant Shoemaker denied the grievance on November 13, 2017. (*Id.* at 38; Doc. 108, p. 6, ¶ 37). On that same day, Mr. Reid-Douglas filed an appeal to Defendant DeParlos. (Doc. 108, p. 6, ¶ 38; Doc. 108, p. 81). LCP has no record of this appeal. (Doc. 86, ¶ 39). Mr. Reid-Douglas received no response to his appeal. (Doc. 108, p. 6, ¶ 38).

On September 13, 2017, Correctional Officer Balliet ("C.O. Balliet") witnessed Mrs. Reid-Douglas "hiding/leaving" notes for Mr. Reid-Douglas within the prison law library, in violation of prison rules including, *inter alia*,

"Unauthorized contact including any form of contact with inmates in isolation or other cellblocks unless authorized."  (Doc. 86, ¶¶ 41, 42; Doc. 108, p. 7, ¶¶ 41, 42; Doc. 87, pp. 64, 65).  C.O. Balliet reported the incident to his supervisor, Defendant White, and issued an incident report.  (Doc. 86, ¶ 43; Doc. 108, p. 7, ¶ 43; Doc. 87, pp. 64, 65).  On October 26, 2017, following a hearing, Mrs. Reid-Douglas was found guilty of unauthorized contact and sentenced to 10 days "DLU".  (Doc. 87, pp. 64, 65).

On September 26, 2017, Mr. Reid-Douglas served the Lycoming County Board of Commissioners, Defendants McKernan, Mussare, and Mirabito, and Prison Administration, Defendants DeParlos, Shoemaker, and Ebner, with a Petition for Writ of Mandamus concerning the "denial and violation of [his] constitutional rights governing the First Amendment of the U.S. Constitution denying my wife and myself to correspond especially after our son passed away." (Doc. 108, p. 7, ¶ 46; Doc. 108, p. 39, ¶ 10; Doc. 108, pp. 67-77).  On October 10, 2017, he filed the petition in the Court of Common Pleas of Lycoming County. (Doc. 108, p. 7, ¶ 46).

On October 13, 2017, Plaintiffs were housed on different cellblocks and were on separation from one another because they were co-defendants in a criminal conspiracy case.  (Doc. 86, ¶ 44; Doc. 108, ¶ 43).  Inmates housed in

different cellblocks are not permitted to have contact with each other. (Doc. 86, ¶ 45). Nor are inmates on separation. (*Id.*). In "Defendants' Response to the Court's August 13, 2019 Discovery Order" concerning "[a]ny and all rules, regulations, policies, and procedures, governing separation of co-defendants," Defendants state "[t]here is no policy regarding inmate separations, which are handled on a case-by-case basis. In this case, plaintiffs were placed on separation because they were co-defendants." (Doc. 84, p. 3; Doc. 108-1, pp. 65, 66). Plaintiffs submit the declaration of Inmate Kadeen Crawford who states that while incarcerated at LCP he was housed on the same block as one of his codefendants. (Doc. 108, pp. 60, 61).

When Mrs. Reid-Douglas was returning to her cell block from visitation on October 13, 2017, C.O. Balliet observed her advance toward the law library and begin verbally communicating with Mr. Reid-Douglas, who was performing legal work in the law library. (Doc. 86, ¶ 46; Doc. 108, ¶ 45; Doc. 87, p. 63). C.O. Balliet instructed Mrs. Reid-Douglas to return to Sub Control 3; she refused and continued to communicate with Mr. Reid-Douglas. (Doc, 86, ¶ 46). According to the incident report, "[a]fter several moments she began walking towards Sub 3, stopping when she was between two of Central Control's windows in an attempt to conceal herself. She then began communicating with Inmate Reid in the library

again.  This CO however could still see this inmate, and hear her yelling as well.  I

informed this inmate she would be receiving a write-up, after which she returned to

her block."  (Doc. 87, p. 63).  Mrs. Reid-Douglas received a disciplinary infraction

on that same day charging her with Disruption of Prison Routine, Excessive Noise,

Unauthorized Contact, Refusing to Obey an Order, and Presence in an

Unauthorized Area.  (Doc. 87, p. 63).  On October 26, 2017, based on the incident

report and Mrs. Reid-Douglas's statement at the disciplinary hearing, Mrs. Reid-

Douglas was found guilty of unauthorized conduct and refusing orders and

sentenced to ten days "DLU".  (*Id.*).

On October 13, 2017, Defendant White issued Mr. Reid-Douglas a

misconduct setting forth the following: "On the above date and time, inmate Reid

was observed via C.C. Video intentionally approaching the library windows and

signaling his wife, Scott, D. as she was leaving the visitation area; in an effort to

communicate with the female inmate.  Inmate Reid and Inmate Scott are currently

on separation as codefendants in their legal case."  (Doc. 87, p. 46).  Defendant

White issued an incident report charging Mr. Reid-Douglas with "unauthorized

contact (with codefendant)".  (Doc. 86, ¶ 51; Doc. 87, p. 46).  Defendant White

also noted in the incident report that "[d]ue to this inmate's ongoing efforts to

communicate with [Mrs. Reid-Douglas] he is receiving this disciplinary

infraction." (Doc. 87, p. 46). At the hearing, Mr. Reid-Douglas stated "I was informing my wife about my oldest son getting locked up. I wrote requests to you and the Warden. My counselor said she couldn't tell her." (*Id.*). He was found guilty of unauthorized contact and sentenced to 10 days "DLU". (*Id.*).

Plaintiffs do not dispute that C.O. Balliet and Defendant White observed them communicating and engaging in unauthorized contact. (Doc. 108, p. 8, ¶¶ 51, 52). They state "[i]t is undisputed that on October 6, 2017, and October 13, 2017 that Plaintiffs were communicating with each other when Mrs. Reid-Douglas was returning from visitation so Mr. Reid-Douglas can inform his wife about their oldest son spiraling out of control due [to] the death of his little brother and getting locked up of which Defendant DeParlos, Shoemaker and Counselor ignored Mr. Reid-Douglas's request to pass such important information. As such, this was conveyed at Plaintiffs [sic] hearings and through request slips." (Doc. 108, p. 7, ¶ 45).

Plaintiffs do dispute that the incident reports were issued based on the conduct in which they were engaged. (*Id.*). They contend that they were issued in retaliation for the filing of the petition for writ of mandamus. (*Id.*). C.O. Balliet and Defendant White declare that they had no knowledge of a mandamus complaint having been filed at the time they issued the incident reports. (Doc. 86,

¶¶ 48, 54; Doc. 87, p. 59, ¶ 11; Doc. 87, p. 41, ¶ 10). Plaintiffs dispute that C.O.

Balliet and Defendant White lacked knowledge of the petition for writ of

mandamus as it was filed three days prior to the issuance of the incident report.

(Doc. 108, p. 7, ¶ 47).

Plaintiffs do not dispute that they failed to adduce evidence that Defendants

McKernan, Mussare, Mirabito, DeParlos, and Shoemaker unlawfully retaliated

against them in violation of the First Amendment. (Doc. 86, ¶¶ 76, 79, 80; Doc.

108, p. 10, ¶¶ 75, 78, 79; Doc. 113, p. 2, ¶ 3, p. 3, ¶ 5).

### C.    Discussion

Section 1983 of Title 42 of the United States Code offers private

citizens a cause of action for violations of federal law by state officials. *See*

42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress....

*Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v.*

*Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a

plaintiff must allege "the violation of a right secured by the Constitution and laws

of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

1. First Amendment Right to Intimate Association

The First Amendment to the Constitution of the United States, made applicable to the States by the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), offers protection for a wide variety of expressive activities, *inter alia*. *See* U.S. Const. amend I. It protects the right of "intimate association" that "involves an individual's right to enter into and maintain intimate or private relationships free of state intrusion." *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000). Plaintiffs assert that LCP's inmate to inmate correspondence policy violates their First Amendment right to intimate association. Defendants initially seek an entry of summary judgment on the ground that the policy is valid. Alternatively, they argue that they are entitled to qualified immunity.

a. *Turner Analysis*

In considering the prison policy at issue in the context of Plaintiffs' First Amendment right to intimate association, we are guided by the following analysis set forth in *Overton v. Bazzetta*, 539 U.S. 126, 131–32 (2003):

> We have said that the Constitution protects "certain kinds of highly personal relationships," *Roberts v. United States Jaycees*, 468 U.S. 609,

618, 619–620, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). And outside the prison context, there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents. *See Moore v. East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

This is not an appropriate case for further elaboration of those matters. The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration. *See Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001). And, as our cases have established, freedom of association is among the rights least compatible with incarceration. *See Jones, supra*, at 125–126, 97 S.Ct. 2532; *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Some curtailment of that freedom must be expected in the prison context.

We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners. We need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests. This suffices to sustain the regulation in question. *See Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). We have taken a similar approach in previous cases, such as *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), which we cited with approval in *Turner*. In *Pell*, we found it unnecessary to decide whether an asserted First Amendment right survived incarceration. Prison administrators had reasonably exercised their judgment as to the appropriate means of furthering penological goals, and that was the controlling rationale for our decision. We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a

corrections system and for determining the most appropriate means to accomplish them. *See, e.g., Pell, supra*, at 826–827, 94 S.Ct. 2800; *Helms, supra*, at 467, 103 S.Ct. 864; *Thornburgh v. Abbott*, 490 U.S. 401, 408, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Jones, supra*, at 126, 128, 97 S.Ct. 2532; *Turner, supra*, at 85, 89, 107 S.Ct. 2254; *Block v. Rutherford*, 468 U.S. 576, 588, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Bell v. Wolfish*, 441 U.S. 520, 562, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it. *See Jones, supra*, at 128, 97 S.Ct. 2532; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2 d 282 (1987); *Shaw, supra*, at 232, 121 S.Ct. 1475.

*Overton v. Bazzetta*, 539 U.S. 126, 131–32 (2003). "[F]our factors are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a " 'valid, rational connection' " to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are "ready alternatives" to the regulation." *Id.* citing *Turner*, 482 U.S., at 89–91.[3] "The objective is to determine whether the regulation

---

[3] We recognize that the courts within the Third Circuit apply the *Turner* standard to incoming mail and the *Procunier v. Martinez*, 416 U.S. 396 (1974), standard to outgoing mail. *Nasir v. Morgan*, 350 F.3d 366, 371 (3d Cir. 2003) ("Because *Thornburgh [v. Abbott*, 490 U.S. 401 (1989),] holds that *Turner* does not squarely overrule *Martinez* as applied to outgoing mail, we will apply *Turner* to incoming mail and *Martinez* to outgoing correspondence."). Because Plaintiffs only challenge the policy as it relates to correspondence with one another within the prison, we will utilize the *Turner* standard.

is reasonable given the prison administrators' penological concerns and the inmate's interest in engaging in the constitutionally protected activity." *DeHart v. Horn*, 227 F.3d 47, 59 (3d Cir. 2000).

The most important prong of the *Turner* analysis requires a rational connection between the policy and the legitimate governmental interest that justifies it. *Nasir v. Morgan*, 350 F.3d 366, 372 (3d Cir. 2003). "According to *Turner*, a regulation will be sustained unless 'the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.' " *Id., citing Turner*, 482 U.S. at 89-90.

LCP's inmate to inmate mail policy, contained in the inmate handbook, states that "[u]nless authorized by the prison administration inmates are not permitted to correspond with other inmates. Sometimes, immediate family members are permitted to correspond with one another, but must receive permission before doing so." (Doc. 86, ¶ 5; Doc. 87, p. 21; Doc. 108, p. 19). LCP Prison Policy 16.1, "Inmate Mail," states in relevant part: "1. Inmates are not permitted to correspond with prohibited parties or through a third party. 2. Inmates are not permitted to correspond with inmates in other sections of the prison or with inmates in other correctional institutions without prior permission of

prison administration. This includes Lycoming County Prison inmates transferred to other county prisons." (Doc. 86, ¶ 6; Doc. 87, p. 23; Doc. 108, p. 23).

The stated purpose and rational of the policy is "to protect the safety and security of the prison from the risk that inmates may communicate to: a. develop and maintain informal organizations, such as gangs, which pose a threat to the safety and security of Prison staff and/or other inmates; b. communicate the layout of the Prison; c. communicate escape plans; d. coordinate the movement of contraband into and out of the Prison; e. coordinate violent acts against Prison staff and/or other inmates; f. communicate the number, movement, and schedule of Prison staff on shift at a given time; and, g. track the movements of other inmates." (Doc. 87, Shoemaker Decl., pp. 5-14, ¶ 19). The policy is clearly rationally connected to the legitimate governmental interest of maintaining internal prison safety and security of inmates and prison staff.

Plaintiffs argue that the inmate handbook and "16.1 inmate mail policy" "holds no weight at all as a valid policy reasonably related to the legitimate penological interests" because it is a "general guideline on inmate to inmate correspondence" and does not specifically address "co-defendants spousal correspondence." (Doc. 112, pp. 6, 7). They assert "[o]ne (1) there is no mentioning of when spouses could or could not correspond with one another. Two

(2) There is no mentioning of why co-defendants who are married or immediate family cannot correspond and what security concerns exist. Three (3) there is no mentioning of steps taken to determine how they approve or disapprove such correspondence. Four (4) there is no mentioning of whether outside authorities have an ongoing investigation against the inmates banning such correspondence. And five (5) there is no mentioning of what particular inmates that concern the Defendants, wherein that will legitimately threaten the safety and security of their prison, by allowing a married couple to correspond when housed in the same institution." (*Id.*) They argue that the policy is invalid because they "were not two prisoners whom [sic] formed a relationship while incarcerated, rather they are a married couple whom bears children with each other, and have been with each other for (10) years, whom [sic] happen to have been incarcerated in the same prison as pre-trial detainees." (Doc. 112, p. 5). This position, which is prevalent in their record submissions (Doc. 108), in their declarations (Doc. 108, pp. 38-51; Doc. 109), and in their supporting brief (Doc. 112), is borne out of their First Amendment right to intimate association and an expectation that they should be granted an exception to the inmate to inmate mail policy because it hindered their ability to communicate about serious family circumstances.

We reject Plaintiffs' argument on two grounds.  First, in utilizing the approach set forth in *Overton*, *supra,* it is clear from the record that the challenged policy bears a valid rational relation to the legitimate penological interest of maintaining the safety and security of inmates and prison staff.  Second, in *Shaw v. Murphy*, 532 U.S. 223 (2001), the Supreme Court determined that the "*Turner* test, by its terms, simply does not accommodate valuations of content. On the contrary, the *Turner* factors concern only the relationship between the asserted penological interests and the prison regulation." *Shaw*, 532 U.S. at 231 citing *Turner*, 482 U.S. at 89.  The *Shaw* Court further stated:

> Moreover, under *Turner* and its predecessors, prison officials are to remain the primary arbiters of the problems that arise in prison management. *Ibid.*; *see also Martinez, supra*, at 405, 94 S.Ct. 1800 ("[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform"). If courts were permitted to enhance constitutional protection based on their assessments of the content of the particular communications, courts would be in a position to assume a greater role in decisions affecting prison administration. Seeking to avoid " 'unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration,' " *Turner*, 482 U.S., at 89, 107 S.Ct. 2254 (quoting *Martinez, supra*, at 407, 94 S.Ct. 1800) (alteration in original), we reject an alteration of the *Turner* analysis that would entail additional federal-court oversight.

*Shaw*, 532 U.S. at 230–31.

The policy is clearly rationally connected to the legitimate governmental interest.  As such, it satisfies the first *Turner* factor.

The second *Turner* factor considers whether there are "alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 89. "Where 'other avenues' remain available for the exercise of the asserted right, *see Jones v. North Carolina Prisoners' Union, supra*, 433 U.S., at 131, 97 S.Ct., at 2540, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.' *Pell v. Procunier, supra*, 417 U.S., at 827, 94 S.Ct., at 2806." *Turner*, 482 U.S. at 90. LCP's policy does not deprive prisoners of all means of expression. Rather, it only bars written correspondence between a limited group of individuals with whom prison officials have particular cause to be concerned— inmates within LCP's prison walls, former LCP inmates transferred to other correctional facilities, including county prisons, and inmates in other correctional institutions.

As concerns the third factor, where a right "can be exercised only at the cost of significantly less liberty and safety for everyone else ... the choice made by corrections officials ... should not be lightly set aside by the courts." *Turner*, 482 U.S. at 92. This factor weighs in favor of Plaintiffs.

If LCP were to monitor all inmate to inmate correspondence, Defendant Shoemaker states that it would have a negative effect on other inmates and prison resources; LCP has only one staff member per day who, in addition to correctional

officer duties, is solely responsible for screening incoming mail for contraband. (Doc. 86, ¶¶ 13, 16). LCP does not have the manpower, time, money or training to monitor inmate-to-inmate correspondence. (Doc. 86, ¶¶ 13-15, 17, 18; Doc. 108, p. 3, ¶ 15). He further notes that "Correctional Officers at the Prison are already at their capacity in terms of responsibilities. They are responsible for covering cell-blocks and operations on a 24 hours a day, 7 days a week, 365 days a year basis, and in addition they from time to time must cover inmate transports and hospitalizations. It would be a massive drain on Prison personnel and Prison resources to allow inmate-to-inmate mail on the condition that such mail may be carefully screened for hidden messages." (Doc. 86, ¶¶ 19, 20). Plaintiffs counter that Defendants' position is contradicted by their own evidence which demonstrates that, pursuant to the policy, the prison is currently monitoring inmate to inmate mail. (Doc. 112, p. 7). "Plaintiffs [sic] interpretation of this passage is that if an inmate's request for correspondence is approved, the Defendants 'will' monitor all correspondence... Therefore, Defendants can/will monitor the Plaintiff's correspondence from one another." (Doc. 112, p. 7). They also provide declarations of inmates housed within LCP who, pursuant to the policy, were permitted to correspond with one another.

It is undisputed that when inmates are granted permission to correspond with one another pursuant to the policy, Defendants do, in fact, monitor all their correspondence. And, while Defendants contend that monitoring such correspondence greatly taxes prison resources, they do not provide solid evidence to support this contention. They simply indicate that there is only one correctional officer who monitors incoming mail and state, in a conclusory fashion, that monitoring inmate to inmate correspondence taxes prison resources. They do not produce evidence of the amount of inmate to inmate correspondence requests that are granted or the volume of the correspondence, and they fail to provide evidence concerning the drain on resource such as the manpower and time allotted or required to monitor such correspondence. In short, Defendants fail to produce evidence of the taxing of resources specifically attributable to the monitoring of inmate to inmate correspondence and do not demonstrate that the right can be exercised only at the cost of significantly less liberty and safety for everyone else.

The fourth factor also weighs in Plaintiffs' favor. If there are clear alternatives available, the regulation is less likely to be upheld. *Nasir*, 350 F.3d at 373. As an alternative, Plaintiff propose a separate policy, or at the very least, an exception to the policy, allowing inmate to inmate correspondence between spouses which would require prison officials to monitor all their correspondence.

(Doc. 112, p. 10). Defendants respond that the prison does not have the resources or training to monitor such correspondence "which would require staff to read, decipher, and evaluate all potential threats contained or hidden within said mail." (Doc. 86, ¶¶ 13-15, 17, 18; Doc. 87, Shoemaker Decl. ¶¶). As such, "the Prison has no ready alternative to its policy that generally bans inmate to inmate mail, unless permission is received otherwise." (Doc. 87, Shoemaker Decl., p. 12, ¶ 31).

There is no doubt that *Turner* recognizes the real possibility that prisoners develop jargon or code to "prevent detection of their real messages." *Nasir*, 350 F.3d at 373, citing *Turner*, 482 U.S. at 93. And *Nasir*, in upholding a prohibition on correspondence between inmates and former inmates, rejected the proposed alternative to completely monitor inmate correspondence to prevent dangerous communication. *Nasir*, 350 F.3d at 373, 74. The *Nasir* court concluded that "[b]ecause there would be an inherent risk of missing dangerous communications, both through the use of deceptive language and due to the volume of incoming mail that prison staff would be required to read and review, we do not feel that Appellant Nasir presents a reasonable alternative to the Policy Statement." *See Nasir*, 350 F.3d at 373-74.

However, we find that the alternative offered by the Plaintiffs, that married inmates be afforded the opportunity to correspond, subject to the monitoring of

their correspondence, is a narrow, reasonable and ascertainable alternative that will not tax prison resources or jeopardize prison security. This weighs against upholding the regulation.

In viewing the evidentiary record, and all reasonable inferences therefrom in the light most favorable to Plaintiffs, we find that LCP's policy governing inmate to inmate correspondence, as it concerns correspondence between married inmates, is unreasonable when considering the prison administrators' penological concerns against the backdrop of Plaintiffs' First Amendment right to intimate association. *DeHart v. Horn*, 227 F.3d 47, 59 (3d Cir. 2000).

### b.    *Qualified Immunity*

Despite the above finding, we conclude that Defendants are entitled to an entry of summary judgment on the grounds of qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

reasonably." *Id.* It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing *Pearson*, 555 U.S. at 244).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), overruled in part by *Pearson*, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two *Saucier* prongs should be addressed first). Defendants argue that even if the Court were to conclude that they violated Plaintiffs' First Amendment rights in enforcing the prohibition on inmate to inmate correspondence in the context of married inmates, they are entitled to an entry of summary judgment on the second prong. (Doc. 102, p. 33).

> "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. "This inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition," *id.* at 201, and "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.' " *Pearson*, 129 S.Ct. at 822 (quoting *Wilson v. Layne*, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (internal quotation marks omitted)); *see also*

> *Walter*, 544 F.3d at 191 (noting that we have characterized the second
> prong of the Saucier test as comprising two questions: "whether the
> right alleged to have been violated was clearly established in the
> existing law at the time of the violation; and ... whether a reasonable
> official knew or should have known that the alleged action violated the
> plaintiffs' rights" (quoting *Rouse v. Plantier*, 182 F.3d 192, 196–97 (3d
> Cir.1999)). "If the law did not put the officer on notice that his conduct
> would be clearly unlawful, summary judgment based on qualified
> immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151.

*Bayer v. Monroe Cty. Children & Youth Servs.*, 577 F.3d 186, 192–93 (3d Cir.

2009)

Review of Supreme Court precedent, and the scant non-persuasive cases

unearthed during our research, reveals that the parameters of the right to intimate

association within prison walls are not clearly established. The most instructive

case discussing the issue in the prison context is the *Overton* case, decided by the

Supreme Court in 2003, quoted at length *supra*. In considering the constitutional

ramifications of a prison regulation placing restrictions on visits with prison

inmates, the Court noted that an inmate does not retain rights inconsistent with

proper imprisonment, pronounced that the right to intimate association is among

the rights least compatible with incarceration, and observed that some curtailment

of that freedom must be expected in the prison context. *Overton*, 539 U.S. at 131–

32 (citations omitted). The Supreme Court stopped short of finding that any right

to intimate association is altogether terminated by incarceration or is always

irrelevant to claims made by prisoners.  But, it also declined to explore or define

the asserted right at any length or determine the extent to which it survives

incarceration.  Instead, the *Overton* court resolved the case utilizing the well-

settled approach of determining whether the challenged regulation passed

constitutional muster.  The Supreme Court has not revisited the issue.

It is not clearly established that the right to intimate association in the prison

setting trumps the discretion of prison officials and deference to prison policies in

matters of internal security.  "A prison's internal security is peculiarly a matter

normally left to the discretion of prison administrators," *Rhodes v. Chapman*, 452

U.S. 337, 350, (1981), and "[p]rison administrators ... should be accorded wide-

ranging deference in the adoption and execution of policies and practices that in

their judgment are needed to preserve internal order and discipline and to maintain

institutional security," *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).  As such, we

cannot conclude that it would be clear to a reasonable prison administrator that his

conduct, in enforcing the policy prohibiting inmate to inmate correspondence in

the context of married inmates, based on overarching internal security concerns of

both prison staff and inmates, was unlawful.  Defendants are entitled to summary

judgment on qualified immunity grounds.

2. <u>Retaliation</u>

        *a.    Exhaustion*

     The Prison Litigation Reform Act of 1996 (the "PLRA") "mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) ("[I]t is beyond the power of this court—or any other—to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis."). The text "suggests no limits on an inmate's obligation to exhaust– irrespective of 'special circumstances.'" *Id.* "And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account. *See Miller v. French*, 530 U.S. 327, 337, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (explaining that "[t]he mandatory 'shall' ... normally creates an obligation impervious to judicial discretion")." *Id.* at 1856-57. While recognizing that the PLRA requires that prisoners comply with the procedural demands of a system created by their jailors, the United States Court of Appeals for the Third Circuit recently noted that the jailors must comply with the demands of the system they created. *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019). The Court went on to hold that "as soon as a prison fails to respond to a properly submitted grievance or appeal within

the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement." (*Id.*).

Mr. Reid-Douglas filed a grievance on November 12, 2017, alleging that misconducts issued on October 13, 2017 and October 26, 2017, were in retaliation for him filing a petition for writ of mandamus. (Doc. 86, ¶ 37; Doc. 108, p. 6, ¶ 36). Defendant Shoemaker denied the grievance on November 13, 2017. (*Id.* at 38; Doc. 108, p. 6, ¶ 37). On that same day, Mr. Reid-Douglas filed an appeal to Defendant DeParlos. (Doc. 108, p. 6, ¶ 38; Doc. 108, p. 81). LCP has no record of this appeal. (Doc. 86, ¶ 39). It is undisputed that Defendant DeParlos did not respond to the appeal. (Doc. 108, p. 6, ¶ 38). Applying the recent holding to the record before us, we ae compelled to conclude that Mr. Reid-Douglas timely appealed and that the Warden failed to respond to that appeal in accordance with LCP's grievance policy. This failure rendered LCP's administrative remedy procedure unavailable to Mr. Reid-Douglas and allowed him to come into federal court. *Shifflett*, 934 F.3d at 366.

### b.     *Merits*

The First Amendment offers protection for a wide variety of expressive activities. *See* U.S. Const. amend I. Prison officials may be held liable for

retaliatory conduct that was motivated "'in substantial part by a desire to punish [the prisoner] for exercise of a constitutional right.'" *Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000) (citation omitted).  A prisoner asserting a retaliation claim must establish the following: (1) "the conduct which led to the alleged retaliation was constitutionally protected"; (2) "he suffered some adverse action at the hands of the prison officials ... sufficient to deter a person of ordinary firmness from exercising his constitutional rights"; and (3) there is a "causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)  (internal quotation marks and citation omitted).

Plaintiffs assert that they were each issued a misconduct for exercising their First Amendment rights, the filing of the petition for writ of mandamus, and, in turn, were sanctioned with disciplinary confinement. The filing of a lawsuit is protected conduct that falls within the ambit of the First Amendment. *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *see also Allah,* 229 F.3d at 224 (noting that it is well settled that "prisoners have a constitutional right to access to the courts").  Regarding adverse action, conduct is adverse if a factfinder could conclude that the alleged retaliatory conduct was sufficient "to deter a person of ordinary firmness" from exercising his constitutional rights.  *Bistrian v. Levi*, 696

F.3d 352, 376 (3d Cir. 2012).  Allegations of being falsely charged with misconduct based on retaliatory motives generally satisfies the requirement that an inmate establish whether the actions purportedly taken in retaliation for this conduct are sufficiently "adverse" to constitute constitutionally cognizable infringements.  *See Smith v. Mensinger*, 293 F.3d 641, 653 (2002) (finding that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment).  The last *Rauser* prong requires a prisoner to establish a causal link between the exercise of his constitutional rights and the adverse action taken against him. The court employs a burden-shifting regime to determine whether a causal link exists. The prisoner bears the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him or retaliate against him. *See Rauser,* 241 F.3d at 333 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).  Mr. Reid-Douglas filed a Petition for Writ of Mandamus concerning "the denial and violation of [his] constitutional rights governing the First Amendment of the U.S. Constitution denying my wife and myself to correspond especially after our son passed away" at the end of September 2017. (Doc. 108, p. 7, ¶ 46; Doc. 108, p. 39, ¶ 10; Doc. 108, pp. 67-77).  On October 10, 2017, he filed the petition in the Court of Common Pleas of Lycoming County.

(Doc. 108, p. 7, ¶ 46).  The misconducts were issued on October 13, 2017.

Defendants do not dispute that Plaintiffs meet the *Rauser* prongs.

Once these elements are established, the burden shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same disciplinary action even in the absence of the protected activity. *See id.* If the defendants prove that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest, they will prevail in the retaliation action.  *See id.* at 334.

Defendants invoke the same decision defense.  They argue that Defendant White and C.O. Balliet would have taken the same disciplinary action even in the absence of the protected activity. Based on the record, we conclude that Defendants have met their burden of showing, as a matter of law, that even in the absence of Plaintiffs' protected conduct, Defendant White and C.O. Balliet would have brought the misconduct charges against them for reasons reasonably related to a legitimate penological interest. [4]  The evidence of Plaintiffs' guilt as to the misconduct charges (Doc. 86, p. 46; Doc. 87, p. 63), is, by itself, sufficient to meet that burden. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir.2002) (finding that

---

[4] Inasmuch as Count II can be read to include allegations that C.O. Balliet (who was dismissed at an early stage in the litigation) retaliated against Plaintiffs by issuing a misconduct on October 13, 2017, it is clear based on the record, including the declaration of C.O. Balliet, that he, too, would be entitled to an entry of summary judgment on this claim.

"[g]iven the quantum of evidence of Carter's misconduct, we cannot say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the 'broad discretion' that we must afford them."); *see also Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir.1994) (concluding that, because the finding of guilt in the prisoner's disciplinary hearing was based on "some evidence," that finding "essentially checkmates his retaliation claim"). Even if it was not, the finding of guilt following a hearing, when coupled with the fact that Plaintiffs do not dispute that Defendant White and C.O. Balliet observed them communicating and engaging in unauthorized contact (Doc. 108, p. 8, ¶¶ 51, 52), and their admission that "[i]t is undisputed that on October 6, 2017, and October 13, 2017 that Plaintiffs were communicating with each other when Mrs. Reid-Douglas was returning from visitation so Mr. Reid-Douglas can inform his wife about their oldest son spiraling out of control due [to] the death of his little brother and getting locked up of which Defendant DeParlos, Shoemaker and Counselor ignored Mr. Reid-Douglas's request to pass such important information[,]" is sufficient. (Doc. 108, p. 7, ¶ 45). Plaintiffs fail to raise a genuine issue of material fact on this point, and our review reveals none. Considering the above, Defendant White and C.O. Balliet issued incident reports charging Plaintiffs with prison infractions, for reasons reasonably related to a legitimate penological interest.

Plaintiffs do not dispute that they failed to adduce evidence that Defendants McKernan, Mussare, Mirabito, DeParlos, and Shoemaker unlawfully retaliated against them in violation of the First Amendment. (Doc. 86, ¶¶ 76, 79, 80; Doc. 108, p. 10, ¶¶ 75, 78, 79; Doc. 113, p. 2, ¶ 3, p. 3, ¶ 5).

Based on the foregoing, Defendants are entitled to an entry of summary judgment on the First Amendment retaliation claim.

## III.   Conclusion

For the reasons set forth above, the Court will grant Defendants' motion for summary judgment on the grounds of qualified immunity on Plaintiffs' First Amendment right to intimate association claim.  (Doc. 39, pp. 3-7, "Count I Violation of First Amendment Right to Intimate Association").  The Court will also grant Defendants' motion for summary judgment on the First Amendment retaliation claim.  (Doc. 39, pp. 7-10, "Count II Retaliation for Exercising First Amendment Right").

The complaint against Defendant Ebner will be dismissed, in its entirety, with prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(2).

Also, Plaintiffs' motion (Doc. 99) for a protective order will be denied as moot.

An appropriate Order will issue.